**IN THE COURT OF APPEALS OF IOWA**

No. 22-0199
Filed November 8, 2023

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**ABEL GOMEZ MEDINA,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Scott J. Beattie, Judge.

The defendant appeals his convictions for second-degree sexual abuse, third-degree sexual abuse, and indecent contact with a child. **AFFIRMED.**

Benjamin D. Bergmann and Alexander Smith of Parrish Kruidenier Dunn Gentry Brown Bergmann & Messamer L.L.P., Des Moines, for appellant.

Brenna Bird, Attorney General, and Sheryl Soich, Assistant Attorney General, for appellee.

Considered by Greer, P.J., and Schumacher and Ahlers, JJ.

**GREER, Presiding Judge.**

Abel Gomez Medina appeals his convictions for second-degree sexual abuse, third-degree sexual abuse, and indecent contact with a child. On appeal, he argues that the district court improperly allowed testimony by the complaining witness, K.D., via closed-circuit television, the prosecutor engaged in misconduct by calling an exculpatory witness a liar during closing argument, and the district court improperly excluded two 911 call logs that related to the victim's credibility. We find the district court did not abuse its discretion in allowing K.D. to testify via closed-circuit television under Iowa Code section 915.38(1)(a) (2021) when she was seventeen and section 915.38(1)(c) when she was eighteen because testifying in open court would impair K.D.'s ability to communicate and it was necessary to protect her from further severe trauma. Likewise, under our de novo review, we determine the State's comments during closing argument were not prosecutorial error and the district court did not abuse its discretion when determining the 911 calls offered by Gomez Medina were irrelevant and inadmissible. We affirm the convictions.

**I. Backgrounds Facts and Prior Proceedings.**

K.D. lived in a small home with her stepfather, Gomez Medina; her mother; and three siblings. For several years Gomez Medina's father lived there as well. K.D. shared a bedroom with her younger sister, A.S. K.D.'s two brothers also shared a room, and Gomez Medina and K.D.'s mom shared the last bedroom. As developed during the trial, starting in March 2015, when K.D. was eleven years old, Gomez Medina began to touch K.D.'s breasts and vagina. As time progressed—when K.D. was fifteen—Gomez Medina would react jealously when

K.D. had contact with boys. By this time, Gomez Medina subjected K.D. to various sex acts up to five times a week; including oral, vaginal, and anal sex. To keep her from getting pregnant, Gomez Medina often required K.D. to take Plan B[1] after intercourse. K.D. disclosed Gomez Medina's actions to one of her friends but did not report it to her therapist or anyone else.

In April 2019, Gomez Medina took away K.D.'s cell phone because she was exchanging text messages with a boy and sending sexually-explicit images. Feeling like she "was being controlled," when K.D. got to school she decided to disclose to her school guidance counselor that Gomez Medina had been having sex with her for four years. That disclosure led to the involvement by the Iowa Department of Human Services (DHS), followed by an extensive investigation. As part of that investigation, K.D. participated in an interview with the Blank Children's Hospital STAR Center two days later and described specific details of the sexual abuse by Gomez Medina. L.G.M., K.D.'s younger brother, was also interviewed at the STAR Center in April 2019, during which he repeated disclosures he had made to a mandatory reporter at his school. L.G.M. was ten years old at the time. L.G.M. told the interviewer that Gomez Medina had been doing "inappropriate stuff," which involved "sex" between his father and K.D. and described one time when L.G.M. saw K.D. on top of Gomez Medina while both were naked. L.G.M. said that he was under the bed while this occurred and he saw Gomez Medina and K.D. "doing it." L.G.M. also said that he had told his mother what he had seen and that K.D. had gotten in trouble for it. After the investigation was completed, Gomez

---

[1] The Plan B pill, also referred to as a "morning-after pill," is a contraceptive pill taken after unprotected sex to prevent pregnancy.

Medina was charged with one count of second-degree sexual abuse, in violation of Iowa Code section 709.3(1)(b) (2015), a class "B" felony; four counts of third-degree sexual abuse, in violation of Iowa Code section 709.4(1)(a), 709.4(1)(b)(2), and 709.4(1)(b)(3), a class "C" felony; and one count of indecent contact with a child, in violation of Iowa Code section 709.12, an aggravated misdemeanor.[2]

After charges were brought against Gomez Medina, K.D. was adjudicated a child in need of assistance (CINA) in December 2019 and removed from the family home. K.D.'s living situation was unstable; at various times she lived with foster families, respite providers, and in a group home. At the time of trial, she had moved into independent housing arranged by DHS. K.D. struggled with post-traumatic stress disorder (PTSD), persistent depressive disorder, and generalized anxiety disorder, and she was hospitalized twice for self-harm. Her therapist reported that K.D. had significant difficulty with emotional regulation and angry outbursts.

In August 2021, the district court held a hearing on the State's motion for K.D. to testify via closed-circuit television at trial—K.D. was seventeen at the time. Gomez Medina resisted the motion, arguing his right to confront the witness required that K.D. testify in person. At the hearing, both K.D.'s guardian ad litem (GAL) and her therapist testified. The GAL said she believed that requiring K.D. to testify in front of Gomez Medina would traumatize K.D., in particular because of her PTSD and that K.D. had been worried about making sure she did not run into

---

[2] Although the acts occurred between 2015 and 2019, because there was no change to the code during this time and for ease of reading, we are using the 2015 Iowa Code here.

Gomez Medina outside of court either. When the therapist was called to testify, she noted that given the trauma to K.D., she might experience a "fight or flight or freeze" response impacting her ability to testify truthfully or verbalize issues in Gomez Medina's presence. The therapist stated that she believed the use of closed-circuit television testimony would be necessary at trial to protect K.D. and that seeing Gomez Medina would exacerbate K.D.'s PTSD, depression, and anxiety. Finally, the therapist testified she believed that requiring K.D. to testify in the same room as Gomez Medina would re-traumatize K.D., perhaps even resulting in self-harm behaviors.

The district court granted the motion for K.D. to testify via closed-circuit television, finding that "pursuant to Iowa Code 915.38(1), the trauma caused by [K.D.] testifying in the physical presence of [Gomez Medina] would impair her ability to communicate, and the use of a closed-circuit equipment is necessary to protect her from further trauma."

The case came to trial in October 2021.[3] Prior to trial, the State moved in limine to exclude two 911 call logs of requests for help made by K.D.'s mother as well as any reference to the 911 call logs and the mental health of K.D. if not testified to by K.D. first. The two 911 call logs were from May 2019 and June 2019, seven weeks and nine weeks after K.D.'s report of the alleged assault. The first

---

[3] Although depositions were conducted in December 2019, due to COVID-19 the trial was not first set to take place until August 30, 2021. Gomez Medina moved to continue trial from August 30, 2021, to September 20, 2021, and the district court granted the motion. Next, the State moved for a continuance from September 20, 2021, to October 4, 2021, and the district court granted the motion. After voir dire on October 4, a juror reported that she had tested positive for COVID-19, and the district court ordered a mistrial. Trial finally commenced on October 25, 2021.

call log contains the following notes: "Meet with [K.D.'s mother] . . . [K.D.] hit the caller a couple of times . . . refused rescue." The second call log contains these notes: "Caller's 15 y/o daughter has been banging her head on the wall and actually knocked a hole in the wall for the last couple of hours . . . . [S]he did yell at her mom when mom called 911." The first came after K.D.'s mother asked K.D. to clean the house and the second after K.D.'s mother asked her to clean her room. The district court reserved ruling on those issues until the second day of trial. At that time, the State argued that the 911 call logs were irrelevant, and the district court agreed. Stating "[K.D.] already made the allegations, so to say that they're relevant as to why she made the allegations, I mean, is a little bit difficult because they are after the fact. . . . I think it's not relevant under [Iowa Rule of Evidence 5.403]," the district court sustained the motion and excluded the evidence of the calls.

During the presentation of the State's case, L.G.M. and K.D. testified— L.G.M. in person and K.D. by closed-circuit television. After L.G.M. repeatedly answered that he could not remember ever discussing seeing anything inappropriate at his house and did not remember participating in a STAR Center interview or a deposition, the district court ruled that L.G.M. was unavailable and allowed admission by the State of a recording of L.G.M.'s STAR Center interview. Then, K.D. testified over two days of trial. The first day she was seventeen years old. The second day was her eighteenth birthday. During her testimony, K.D. described multiple specific instances of vaginal, anal, and oral intercourse between herself and Gomez Medina. She described the location of the intercourse, what she was wearing, and what happened afterwards. To avoid pregnancy, K.D.

testified that Gomez Medina would watch her take the Plan B pill afterwards, and that she developed a rash from taking it; she estimated that she took the pill every two weeks or so.

At the start of K.D.'s second day of testimony, Gomez Medina asserted K.D., now eighteen and an adult, should now have to testify live. The district court reviewed its previous ruling and questioned K.D.; it concluded that because K.D. had been diagnosed with PTSD, anxiety, and depression, which led to two inpatient hospitalizations, she could continue to testify via closed-circuit television. In making its ruling, the district court stated, "[A]gain, as the court previously held with her minor age, this is more than just discomfort that would come about because of her presence with [Gomez Medina]. She, because of her previously diagnosed condition would suffer, obviously, significant stress, and it would make it difficult for her to communicate . . . ."

During Gomez Medina's presentation of evidence, he offered L.G.M.'s deposition, in which the child said that he did not remember what happened between K.D. and Gomez Medina, denied that anything happened, and did not want to talk about it. Also in L.G.M.'s deposition, L.G.M. was questioned about the veracity of K.D.'s claims:

> Q. Who told you that [K.D.] was lying? A. My mom told me that she was lying. And I kind of think about that, about it. And I think it was true.
> Q. Okay. Why do—did your mom say what the lies were? A. No.
> Q. Do you know what it was [K.D.] said about your dad? A. No, 'cause I wasn't there at the hospital when she went there.
> Q. Yeah. But you went to the hospital, too; right? A. Yeah. But she didn't tell me what—
> Q. Yeah. So has your mom told you what the—what [K.D.] said? A. [L.G.M. indicated.]
> Q. She just said it's lies? A. [L.G.M. indicated.]

L.G.M. was also asked, "Did your mom say [K.D.]'s lying about inappropriate things?" and L.G.M. answered yes.

At the close of evidence, Gomez Medina moved for a judgment of acquittal, which the district court overruled. During closing argument, the State offered an explanation about L.G.M.'s inability to remember his STAR Center interview or deposition, reminding the jury "[r]emember he specifically said 'Mom said [K.D.] lied.' He had been told in those months over and over 'don't believe your sister.'" After Gomez Medina objected and the district court overruled the objection, the State continued, stating that L.G.M. "had been told by his mom that [K.D.] was lying."

The jury returned verdicts of guilty as charged. The district court sentenced Gomez Medina to the maximum sentence, a term of sixty-seven years: twenty-five years on the conviction for second-degree sexual abuse, ten years for each conviction for third-degree sexual abuse, and two years on the conviction for indecent contact with a child all of which the court ordered Gomez Medina to serve consecutively. Gomez Medina now appeals.

**II. Standard of Review.**

Because Gomez Medina raises constitutional issues through his assertion of a Confrontation Clause violation, our review is de novo, which means we independently evaluate the totality of the circumstances. *See State v. Rogerson*, 855 N.W.2d 495, 498 (Iowa 2014). Under that standard, we examine all the evidence anew without deference to the district court's findings. *State v. Williams*, 972 N.W.2d 720, 723–24 (Iowa 2022). The burden is on the State to show compliance with the Confrontation Clause. *State v. Liggins*, 978 N.W.2d 406, 419

(Iowa 2022).  A claim under the Confrontation Clause does not require reversal if the defendant suffered no harm from the error.  *State v. Brown*, 656 N.W.2d 355, 361 (Iowa 2003).  If there was a violation, the burden is on the State to establish that the error was harmless beyond a reasonable doubt.  *Id.* (citing *State v. Kite*, 513 N.W.2d 720, 721 (Iowa 1994)).

We review both claims of prosecutorial error and non-hearsay evidentiary issues for abuse of discretion.  *State v. Krogmann*, 804 N.W.2d 518, 523 (Iowa 2011) (stating the standard of review for prosecutorial error claims); *State v. Buelow*, 951 N.W. 879, 884 (Iowa 2020) (stating the standard of review for evidentiary issues).  "An abuse of discretion occurs when the trial court exercises its discretion 'on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'"  *State v. Rodriquez*, 636 N.W.2d 234, 239 (Iowa 2001) (citation omitted).  "A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law."  *Id.* (citation omitted).

## III. Analysis.

Gomez Medina makes three arguments on appeal, asserting that the district court improperly (1) allowed K.D.'s closed-circuit testimony because, while K.D. was seventeen, the State failed to demonstrate that testifying in front of Gomez Medina would cause sufficient trauma to K.D. and, thus, Iowa Code section 915.38(1)(a) did not apply; likewise, after K.D. turned eighteen, the State did not demonstrate sufficient necessity for section 915.1(c) to apply; (2) allowed the State to comment during closing argument that K.D.'s mother told L.G.M. that K.D. was lying, which amounts to prosecutorial error; and (3) excluded 911 call

logs based on 911 calls made by K.D.'s mother, in which the mother was reported as describing K.D. hitting her and hitting her own head against the wall, which should have passed the rule 5.403 balancing test for relevance.

### A. Closed-circuit Testimony.

K.D. testified via one-way closed-circuit television over Gomez Medina's objections. The Sixth Amendment of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." *See also* Iowa Const. art. I, § 10.[4] Iowa Code section 915.38(1)(a) allows a minor to testify via closed-circuit television when testifying in the presence of the defendant would cause trauma and would impair the minor's ability to communicate. Section 915.38(1)(c) allows the same for minors or adults who have a mental illness, an intellectual disability, or other developmental disability, as long as the court makes a finding of necessity. Because K.D. was allowed to testify both as a minor under section 915.38(1)(a) on her first day of testimony and as an adult with mental illness under section 915.38(1)(c) on her second day of testimony, we evaluate the admission of that testimony under the tests for each corresponding section.

*Maryland v. Craig*, 497 U.S. 836 (1990), established a three-part test to determine when alternate procedures are necessary to protect a child witness from

---

[4] Gomez Medina does not argue that the analysis under the Iowa Constitution would be different than under the Federal Constitution. "Where a party raises issues under the Iowa Constitution and the Federal Constitution, but does not suggest a different standard be applied under the Iowa Constitution, we generally apply the federal standard." *State v. Edouard*, 854 N.W.2d 421, 452 (Iowa 2014) (Appel, J., concurring specially), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 (Iowa 2016).

trauma when testifying in person in front of a defendant, which Iowa courts have regularly applied:

> (1) The trial court must hear evidence and determine whether use of the closed-circuit television procedure is "necessary to protect the welfare of the particular child witness," (2) the trial court must find that "the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant," and (3) "the trial court must find that the emotional distress suffered by the child witness in the presence of the defendant is more than de minimis, i.e., more than 'mere nervousness or excitement or some reluctance to testify.'"

*State v. Cuevas*, No. 08-1344, 2009 WL 3337606, at *9 n.3 (Iowa Ct. App. Oct. 7, 2009) (quoting *Craig*, 497 U.S. at 855–56).  The critical inquiry is whether the use of the procedure is necessary to further the important state interest of protecting the child witness from additional trauma.  *Craig*, 497 U.S. at 852; *see also State v. White*, No. 22-0522, 2023 WL 5607148, at *6 (Iowa Ct. App. Aug. 30, 2023) (holding that testimony by children's therapist that they would suffer trauma if forced to testify in open court justified allowing them to testify by closed-circuit television).

K.D.'s testimony via closed-circuit television meets these requirements for her testimony while she was still seventeen years old.  The district court heard evidence at a pretrial hearing from the GAL and K.D.'s therapist and made several findings.  First, the district court determined that allowing K.D. to testify out of Gomez Medina's presence prevented her from suffering re-traumatization.  Second, this re-traumatization would stem not from testifying in general but from testifying in front of Gomez Medina specifically.  The court observed that K.D. had not seen Gomez Medina since making the allegations, and K.D.'s therapist testified that K.D. worried not only about testifying in front of him but of seeing him at his

place of work or in the community in general. Third, the district court heard and considered evidence that testifying in the courtroom would not just make K.D. nervous or over-excited but would severely inflame her PTSD, depression, and anxiety. Lastly, the district court heard and considered evidence that the trauma caused by testifying in Gomez Medina's presence would impair K.D.'s ability to communicate. These findings were sufficient for the district court to properly allow K.D. to testify via closed-circuit television while still a minor, and we find the same on our de novo review.

Regarding adult witnesses, Gomez Medina argues that because the United States Supreme Court has not returned to the issue of closed-circuit testimony since *Craig*, and *Craig* only applied to child witnesses, there should be no possibility for closed-circuit testimony for adults. And Gomez Medina maintains that it would be against public policy and "open the floodgates" to restrict "face-to-face confrontation" simply because someone is diagnosed with a mental illness. *See* Iowa Code § 915.38(1)(c). But, Gomez Medina overlooks our own state precedent on remote testimony by adult witnesses, and our rule that: "before permitting a witness to testify via two-way videoconference, the court must make a case-specific determination that the denial of the defendant's confrontation right is necessary to further an important public interest. If the court finds such an interest, it must assure the reliability of the remote testimony." *Rogerson*, 855 N.W.2d at 505 (citing *Craig*, 497 U.S. at 851); *see id.* at 508 (Hecht, J., concurring specially) (referring to the two prongs as the "necessity question" and the "reliability question"); *see also* Iowa Code § 915.38(1)(c).

Applying the test in the case of an adult witness, the district court found K.D.'s testimony via closed-circuit television on her eighteenth birthday also met the requirements of necessity and reliability required. First, just like on the first day of testimony, the use of closed-circuit television was reliable. The parties did not make any objections to their ability to understand K.D. or to her testimony taking place via the same procedures as in the courtroom but from a separate courtroom from Gomez Medina. Second, K.D. had been diagnosed with PTSD, depression, and anxiety; and, after a factual review, the district court determined that testifying in open court while suffering from those mental illnesses specifically would cause K.D. significant harm and affect her ability to testify. Thus, the district court ruled it was necessary to allow K.D. to finish her testimony via closed-circuit television on the morning of her eighteenth birthday. So, after our de novo review, we agree with the district court's findings and conclude the court correctly applied section 915.38 and its requirements, and as such, there was no violation of Gomez Medina's constitutional right to confrontation.

**B. Prosecutorial Error.**

During closing argument, the State offered an explanation for L.G.M.'s change in story in the months between the Star Center interview where he described "inappropriate" behavior and his deposition where his memory was less clear. Gomez Medina objected to "improper argument" after the prosecutor attributed to L.G.M. the statement, "Mom said [K.D.] lied" and surmised that L.G.M. had been repeatedly told "don't believe your sister." Gomez Medina now asserts that is in effect calling an exculpatory witness a "liar." The Due Process Clause of the Fourteenth Amendment of the United States Constitution and article I,

section 9 of the Iowa Constitution provide protection from prosecutorial error.[5]  *See DeVoss v. State*, 648 N.W.2d 56, 64 (Iowa 2002) (stating prosecutorial misconduct that denies the defendant a fair trial is a violation of due process).  To establish a violation of the right to a fair trial by prosecutorial error, the defendant must establish error on the part of the prosecutor and that the error resulted in prejudice to such an extent that the defendant was denied a fair trial.  *State v. Plain*, 898 N.W.2d 801, 818 (Iowa 2017).

To determine whether the actions of the prosecutor rise to the level of ordering a new trial, we look at "(1) [t]he severity and pervasiveness of the misconduct; (2) the significance of the misconduct to the central issues in the case; (3) the strength of the State's evidence; (4) the use of cautionary instructions or other curative measures; (5) the extent to which the defense invited the misconduct."  *State v. Coleman*, 907 N.W.2d 124, 140 (Iowa 2018) (citation omitted).  We consider the fairness to Gomez Medina in the context of the entire trial.  *See State v. Graves*, 668 N.W.2d 860, 880 (Iowa 2003).

Regarding the specific statements that Gomez Medina challenges, isolated statements during closing argument are given additional latitude as, "[i]n closing arguments, counsel . . . may draw conclusions and argue permissible inferences which reasonably flow from the evidence presented."  *State v. Thornton*, 498 N.W.2d 670, 676 (Iowa 1993).  We do not find the State's comments made in the closing amount to prosecutorial error.  First, Gomez Medina placed into evidence

---

[5] Gomez Medina specifies his argument is centered on prosecutorial error, not prosecutorial misconduct.  *See State v. Schlitter,* 881 N.W.2d 380, 393 (Iowa 2016) (noting some prosecutorial conduct might be characterized as intentional, but other prosecutorial conduct can result from an error or a mistake).

L.G.M.'s statements from his deposition that his mother told him K.D. was lying. The State could fairly comment on those statements to explain the change in the child's memory. Next, the statements of K.D.'s veracity were not the personal opinions of the State but were from the mouth of the child. And as the prosecutor argued:

> Your common sense and your experience. We heard about suggestibility from [the forensic interviewer]. We heard the difference but even still—even though he'd been told by his mom that [K.D.] was lying, ladies and gentlemen, he kept saying "I think the lies are true" or something. However you remember that exact wording, rely on your own memory, but he said "I think the lies are true." What his mom was trying to tell him was a lie. He was seemingly at war with himself because he knows what his own eyes saw, and we heard he wants to be with his dad.

On this record, we find this to be a fair argument used merely to explain L.G.M.'s reluctance to testify and eventual lack of memory about what was earlier reported. Thus, this short reference to L.G.M.'s testimony is not improper commentary on the credibility of an exculpatory witness, as Gomez Medina argues. Instead, it is more a comment on testimony Gomez Medina introduced. Therefore, we find no abuse of the district court's discretion here.

### C. Exclusion of 911 Call Logs.

After Gomez Medina made an offer of proof with K.D.'s mother explaining the background of the 911 calls she made, the district court denied their admission or any discussion about them in the presentation of evidence. The offer of proof focused on K.D.'s assaultive behavior towards herself and against her mother, but the mother confirmed that the acts were unrelated to the sexual abuse case against Gomez Medina. To that point, the district court ruled the 911 calls "don't involve, specifically, the allegations made or any actions in relationship to the

allegations made, as the witness has previously noted here this morning. It dealt with other issues, cleaning a room, that were unrelated to the allegations." And the district court found the information constituted "improper character impeachment." Arguing the actions surrounding the calls show the family dynamics, Gomez Medina disputes these findings and asserts the district court abused its discretion.

Evidence of other acts by an alleged victim remains "subject to the strictures" of Iowa Rule of Evidence 5.403. *See* Thomas A. Mauet & Warren D. Wolfson, *Trial Evidence* § 12.4 (7th ed. 2020) (discussing Federal Rule of Evidence 403). Rule 5.403 authorizes the district court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Unfairly prejudicial evidence "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action [that] may cause a jury to base its decision on something other than the established propositions in the case." *State v. Plaster*, 424 N.W.2d 226, 231 (Iowa 1988) (citation omitted). This balancing of probative value against competing dangers is a classic "judgment call on the part of the trial court." *Rodriquez*, 636 N.W.2d at 240. Even more so, "[a]nalyzing and weighing the pertinent costs and benefits [of admitting other acts evidence] is no trivial task. . . . Accordingly, much leeway is given trial judges who must fairly weigh probative value against probable dangers." *Id.* (second alteration in original) (quoting 1 John W. Strong, *McCormick on Evidence* § 185, at 647–48 (5th ed. 1999)).

Here, the district court properly exercised its broad discretion to exclude admission of the two 911 call logs made following calls by K.D.'s mother weeks after the report of sexual abuse by K.D. Despite the claims of Gomez Medina, if the 911 call logs had any relevance, it was to improperly inform the jury about the mental state of K.D. in the time after she revealed the alleged sexual abuse to her school guidance counselor. Rather than helping the jury make a determination of guilt, disclosure of the content of the 911 calls may have turned the trial into an evaluation of the interactions of K.D. and her mother rather than K.D. and Gomez Medina. Furthermore, as the district court noted, the underlying causes of K.D.'s mom calling 911 are unrelated to the alleged sexual abuse. Instead, as the mother characterized the calls, they arose from a dispute over K.D.'s mom requesting that K.D. clean the house or her room and involved K.D. hitting her mom and hitting her own head against the wall. Thus, their admission would not have assisted the jury as they did not make a consequential, disputed fact more or less probable. Given their limited probative value but their high likelihood of causing the jury to make a decision on an improper basis, the district court did not abuse its discretion in not admitting them.

**IV. Conclusion.**

In this case, the complaining witness was properly allowed to testify via closed-circuit television under Iowa Code section 915.38(1)(a) when she was seventeen and section 915.38(1)(c) when she was eighteen because there was sufficient evidence that testifying in open court would impair her ability to communicate and was necessary. In addition, the comments during closing argument that K.D.'s mother told L.G.M. that K.D. was lying were not prosecutorial

error, were introduced into evidence by Gomez Medina, and do not merit a new trial. Lastly, the two 911 call logs were not relevant for any issues at trial and were properly excluded. For these reasons, we affirm Gomez Medina's convictions.

**AFFIRMED.**